139 Nev., Advance Opinion 32

IN THE SUPREME COURT OF THE STATE OF NEVADA

STARR SURPLUS LINES INSURANCE CO.,
Petitioner,
vs.
THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK; AND THE HONORABLE MARK R. DENTON, DISTRICT JUDGE,
Respondents,
  and
JGB VEGAS RETAIL LESSEE, LLC,
Real Party in Interest.

No. 84986



FILED

SEP 1 4 2023

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
DEPUTY CLERK

Original petition for a writ of mandamus or prohibition challenging a district court order denying a motion for summary judgment in an insurance action.

*Petition granted.*

Lewis Roca Rothgerber Christie LLP and Daniel F. Polsenberg and Abraham G. Smith, Las Vegas; Clyde & Co US LLP and Amy M. Samberg and Lee H. Gorlin, Las Vegas,
for Petitioner.

Latham & Watkins LLP and John M. Wilson, San Diego, California; Lemons, Grundy & Eisenberg and Robert L. Eisenberg, Reno,
for Real Party in Interest.

Christian Kravitz Dichter Johnson & Sluga, LLC, and Tyler J. Watson, Las Vegas; Robinson & Cole LLP and Wystan Michael Ackerman, Hartford, Connecticut,
for Amicus Curiae American Property Casualty Insurance Association.

 

McDonald Carano LLP and Adam D. Hosmer-Henner, Chelsea Latino, and Jane E. Susskind, Reno,
for Amicus Curiae Nevada State Medical Association.

Kemp Jones, LLP, and Don Springmeyer, Las Vegas; Reed Smith LLP and David M. Halbreich, Amber S. Finch, Margaret C. McDonald, and Katherine J. Ellena, Los Angeles, California,
for Amicus Curiae Panda Restaurant Group, Inc.

Brownstein Hyatt Farber Schreck, LLP, and Frank M. Flansburg, III, Las Vegas; Covington & Burling LLP and Wendy L. Feng, San Francisco, California,
for Amicus Curiae Boyd Gaming Corporation.

Pisanelli Bice, PLLC, and James J. Pisanelli and Debra L. Spinelli, Las Vegas; Reed Smith LLP and John N. Ellison and Richard P. Lewis, New York, New York,
for Amicus Curiae United Policyholders.

Brownstein Hyatt Farber Schreck, LLP, and Frank M. Flansburg, III, Las Vegas; Latham & Watkins LLP and Brook B. Roberts, John M. Wilson, and Corey D. McGhee, San Diego, California, and Christine G. Rolph, Washington, D.C.,
for Amicus Curiae Caesars Entertainment, Inc.

Brownstein Hyatt Farber Schreck, LLP, and Frank M. Flansburg, III, Las Vegas,
for Amicus Curiae Golden Entertainment, Inc.

Snell & Wilmer, LLP, and Patrick G. Byrne, Las Vegas,
for Amicus Curiae Wynn Resorts, Limited.

Kemp Jones, LLP, and Michael J. Gayan, Las Vegas,
for Amicus Curiae Hilton Worldwide Holdings, Inc.

Messner Reeves LLP and Renee M. Finch, Las Vegas,
for Amici Curiae Bloomin' Brands, Inc.; Circus Circus LV, LP; Restaurant Law Center; and Treasure Island, LLC.

BEFORE THE SUPREME COURT, EN BANC.

## OPINION

By the Court, CADISH, J.:

Real party in interest JGB Vegas Retail Lessee, LLC, owns and operates a retail shopping mall on the Las Vegas Strip. When COVID-19 forced JGB to shut down abruptly, it suffered significant economic losses. It now seeks to recoup those losses under its commercial property insurance policy, arguing that the presence of COVID-19 on the property created the requisite "direct physical loss or damage" covered under the policy. We consider whether that policy provides such coverage. As a matter of law, we conclude it does not.

### FACTS AND PROCEDURAL HISTORY

Petitioner Starr Surplus Lines Insurance Co. provides commercial property insurance. JGB, which owns and operates the "Grand Bazaar Shops" (the Shops) on the Las Vegas Strip, is one of Starr's policyholders. The "perils insured against" under the policy's general coverage grant include "all risks of direct physical loss or damage to covered property while at INSURED LOCATIONS occurring during the Term of this POLICY, except as hereinafter excluded or limited."

The policy also includes a business interruption section, providing coverage for "[l]oss directly resulting from necessary interruption of the Insured's NORMAL business operations caused by direct physical loss or damage to real or personal property covered herein, . . . arising from a peril insured against hereunder" during the term of the policy and while located at insured locations. In addition, the business interruption coverage extends to losses from interruption by civil

or military authority, meaning those losses sustained "when, as a direct result of damage to or destruction of property within" one mile of the Shops "by the peril(s) insured against, access to such described premises is specifically prohibited by order of civil or military authority." This business interruption insurance falls within the policy's time element coverage, which generally permits recovery for "loss resulting from the inability to put damaged property to its normal use." *See* 5 *New Appleman on Insurance Law Library Edition*, § 41.01[2][a] (Jeffery E. Thomas, ed., 2022).

Other time element provisions extend coverage even further. Relevant here, this includes coverages like the extra expense, ingress/egress, and rental value endorsements.[1] Though these endorsements provide coverage for various losses, coverage under each one is contingent on the losses being caused by the perils insured against: "direct physical loss or damage to covered property." Moreover, most of these provisions impose a period of indemnity beginning "with the date of direct physical loss or damage by any of the perils covered herein" and ending "on the date when the damaged or destroyed property at the INSURED LOCATION should be repaired, rebuilt or replaced with the exercise of due diligence and dispatch."[2]

---

[1]Some of these endorsements contain coverage provisions for interruption by civil or military authority comparable to that in the business interruption section as well.

[2]The rental value endorsement's measure of recovery mirrors this period of indemnity, in that it is "for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property." The ingress/egress endorsement and civil or military authority provisions have specified 14-day time limits.

SUPREME COURT OF NEVADA

(O) 1947A

4

Despite broad coverage, the policy also contains multiple exclusions. The pollution and contamination exclusion, for example, bars coverage for "loss or damage caused by or resulting from any of the following regardless of any cause or event contributing concurrently or in any other sequence to the loss":

> 1. contamination;
>
> 2. the actual or threatened release, discharge, dispersal, migration or seepage of POLLUTANTS at an INSURED LOCATION during the Term of this POLICY . . . .

Thus, loss or damage caused by pollution or contamination is excluded. And the policy further defines those excluded pollutants or contaminants as including viruses:

> The term "POLLUTANTS" or "CONTAMINANTS" shall mean any solid, liquid, gaseous or thermal irritant or CONTAMINANT including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals, virus, waste, (waste includes materials to be recycled, reconditioned or reclaimed) or hazardous substances as listed in the Federal WATER Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the U.S. Environmental Protection Agency.

The COVID-19 pandemic began a few months into the policy term, during which the SARS-CoV-2 virus rapidly spread infection throughout the country. As a result, several of JGB's tenants closed their businesses, and by March 2020, Nevada's Governor mandated that all nonessential businesses close to prevent the virus's spread. (Restaurants, we note, were allowed to provide take-out and delivery services during the shutdown.) By June 2020, the Shops were allowed to reopen, subject to

Supreme Court
of
Nevada

(O) 1947A

5

restrictions designed to reduce the spread of the virus. Some of JGB's tenants never reopened.

The closures resulted in economic strife for both JGB and its tenants. Reopening required additional expenses, too: JGB and its tenants installed sanitizer stations, social-distancing signs, and plexiglass and performed regular cleanings to reduce the chance of spreading the virus at the Shops. Amidst the closures and accompanying economic troubles, JGB filed a claim with Starr. It sought coverage for lost business income, extra expenses, and any other applicable coverage "[i]n connection with the recent shutdowns, closures, and other directives."

Starr later responded to JGB's claim with a reservation of rights letter, raising concerns about whether coverage existed. Thereafter, JGB filed suit against Starr for breach of contract, declaratory judgment, violations of the Nevada Unfair Claims Practices Act, and breach of the covenant of good faith and fair dealing. The complaint chiefly alleged that it was "highly likely" that COVID-19 was present on the premises of the Shops, "thus damaging the property that JGB leased to its tenants" and warranting business interruption and other time element coverage under the policy. Meanwhile, Starr formally denied JGB's claim.

Discovery proceeded revealing (1) how the COVID-19 virus spreads in aerosolized form; (2) that SARS-CoV-2 is a physical particle that can deposit onto property for several days, which can then transmit from the infected property as a "fomite"; (3) confirmed cases of COVID-19 at the Shops and statistical modeling indicating a strong likelihood that individuals with COVID-19 were at the Shops before and after the Governor's first closure order; (4) the associated likelihood that these infected individuals rapidly redeposited SARS-CoV-2 onto the Shops'

SUPREME COURT
OF
NEVADA

(O) 1947A

6

property; and (5) various measures used by JGB and its tenants to reduce the chance of catching or spreading the virus. Nevertheless, Starr moved for summary judgment, arguing that the presence of COVID-19 did not amount to the "direct physical loss or damage" needed for coverage as a matter of law. It added that loss of use cannot qualify because it is mere economic loss. Further, Starr argued that coverage for loss or damage caused by a "virus" was precluded under the policy's express exclusions.

In opposition, JGB argued that the plain and ordinary meaning of "direct physical loss or damage" mandated coverage. JGB pointed to its undisputed scientific evidence showing that the SARS-CoV-2 virus is a physical particle that can "land on and attach to property and last for days," can "remain infectious while suspended in air as well as on property," and cannot be removed with routine cleaning. Collectively, it contended that this evidence indicated how the virus both damaged the Shops and rendered the Shops unsafe for their purpose, so as to amount to "direct physical loss or damage."

Following a hearing, the district court granted the motion in part and denied it in part. It concluded that "whether COVID-19, or the virus that causes it, does or does not physically alter property in order to trigger one or more coverages under the Policy is a matter of fact to be determined at trial" and that it had not yet determined whether the pollution and contamination exclusion applies. It rejected JGB's extra-contractual claims as a matter of law and granted summary judgment in Starr's favor on those claims, however, such that only the breach of contract and declaratory relief claims remain. Starr then filed the instant writ petition challenging the denial of summary judgment on the remaining claims.

## DISCUSSION

*We elect to entertain the petition for a writ of mandamus*

In urging the court to entertain the petition, Starr contends that the petition raises legal issues of first impression and fundamental public importance. It emphasizes that it does not dispute JGB's evidence for purposes of resolving these legal issues. Further, Starr underscores the number of pending cases in Nevada district courts addressing these issues, arguing that our review will aid judicial economy. JGB argues that we should deny the petition because fact questions persist.[3]

A writ of mandamus is available to correct clear error or an arbitrary or capricious exercise of discretion when there is no other adequate legal remedy. *Int'l Game Tech., Inc. v. Second Judicial Dist. Court*, 124 Nev. 193, 197, 179 P.3d 556, 558 (2008). It is an extraordinary remedy that "only issue[s] at the discretion of this court." *See State v. Eighth Judicial Dist. Court (Anzalone)*, 118 Nev. 140, 146, 42 P.3d 233, 237 (2002). In exercising this discretion, we have established a general policy of declining to consider writ petitions challenging district court orders denying summary judgment. *Yellow Cab of Reno, Inc. v. Second Judicial Dist. Court*, 127 Nev. 583, 585, 262 P.3d 699, 700 (2011). An exception to this general policy may apply, however, when a writ petition

---

[3]Starr alternatively seeks a writ of prohibition, but it provides no argument as to why prohibition would be an appropriate remedy. Based on the nature of the relief requested and the district court's jurisdiction over breach of contract matters, this petition does not implicate the standard for prohibition relief. *See Las Vegas Sands Corp. v. Eighth Judicial Dist. Court*, 130 Nev. 643, 649, 331 P.3d 905, 909 (2014) (recognizing that a writ of prohibition is appropriate when a district court exceeds its jurisdiction).

(O) 1947A

presents an "opportunity to clarify an important issue of law and doing so serves judicial economy." *Canarelli v. Eighth Judicial Dist. Court*, 138 Nev. 104, 106, 506 P.3d 334, 337 (2022). Even so, our review is improper if factual disputes persist. *See Walker v. Second Judicial Dist. Court*, 136 Nev. 678, 684, 476 P.3d 1194, 1199 (2020).

We conclude that this petition falls within the exception to our general policy. Whether all-risk commercial property insurance like that in Starr's policy covers losses arising from the COVID-19 pandemic presents an important legal issue of first impression "likely to be the subject of extensive litigation." *See Borger v. Eighth Judicial Dist. Court*, 120 Nev. 1021, 1025, 102 P.3d 600, 603 (2004). In fact, Starr has pointed to several cases involving this question that are pending in Nevada district courts, so our clarification may promote "judicial economy and administration by assisting other jurists, parties, and lawyers." *Walker*, 136 Nev. at 683, 476 P.3d at 1198 (internal quotation marks omitted). Although the district court held that factual issues existed, we discern no such fact issues precluding our review of the coverage questions raised in this petition, especially as Starr does not dispute JGB's evidence. *State, Dep't of Transp. v. Eighth Judicial Dist. Court*, 133 Nev. 549, 556, 402 P.3d 677, 684 (2017) (entertaining and issuing writ of mandamus where the court considered undisputed material facts in contract interpretation case); *see also Fed. Ins. Co. v. Coast Converters, Inc.*, 130 Nev. 960, 965, 339 P.3d 1281, 1284 (2014) (recognizing that categorizing loss under an insurance policy was a legal question, such that "the district court erred in sending it to the jury"). We therefore elect to entertain the petition, addressing these legal questions further below.

*Standard of review*

We review de novo a district court order resolving a summary judgment motion. *Renown Reg'l Med. Ctr. v. Second Judicial Dist. Court*, 130 Nev. 824, 828, 335 P.3d 199, 202 (2014). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." NRCP 56(a). If the movant bears its "initial burden of production to show the absence of a genuine issue of material fact," "then the party opposing summary judgment assumes a burden of production to show the existence of a genuine issue of material fact." *Cuzze v. Univ. & Cmty. Coll. Sys. of Nev.*, 123 Nev. 598, 602, 172 P.3d 131, 134 (2007). Interpretation of an insurance policy is also a legal question reviewed de novo. *See Nationwide Mut. Ins. Co. v. Moya*, 108 Nev. 578, 582, 837 P.2d 426, 428 (1992).

*Starr's all-risk policy requires direct physical loss or damage to the covered property, meaning coverage applies when there is a material or tangible destruction of or injury to the covered property itself*

Modern commercial property insurance covers either "named perils" or "all risk." 2 Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* 1568 (20th ed. 2021). As the name suggests, an all-risk insurance policy is designed to cover "losses caused by any fortuitous peril." *Id.*; *see also Coast Converters*, 130 Nev. at 967, 339 P.3d at 1286 ("It is well recognized that insurable loss of or damage to property must be occasioned by a fortuitous, noninevitable, and nonintentional event." (emphasis omitted)). Still, the coverage grant is not totally unlimited. The touchstone of commercial property insurance is that it insures against the property's "damage or destruction." *See* 2 Jeffrey W. Stempel & Erik S. Knutsen, *Stempel and Knutsen on Insurance*

SUPREME COURT
OF
NEVADA

(O) 1947A

10

*Coverage* § 15.01[C] (4th ed. 2019) (explaining how to make out a prima facie case for all-risk coverage).

The parties here contest the reach of coverage in an all-risk policy. While JGB claims coverage under several provisions, the parties' dispute focuses on the phrase "direct physical loss or damage." Starr argues that "direct physical loss or damage" requires either "distinct, demonstrable, physical alteration" to property or "some sort of structural or physical change to a property, actually altering its functionality or use." JGB argues that requiring something like "distinct, demonstrable, physical alteration" is too limiting. It distinguishes between covered damage and loss, maintaining that damage exists where a physical force "alters the surfaces or air of covered property," while loss exists where a physical force, like the COVID-19 virus, is "present on or around covered property, rendering it partially or wholly unusable, unsafe, or unfit for its intended purpose." JGB claims that this latter sort of loss "is recoverable by itself, without need to show 'damage.'"

Resolving this dispute requires that we first assess the policy's text. And we assess language in an insurance policy like we do in any contract: our chief aim is to effectuate the intent of the parties. *Century Sur. Co. v. Casino W., Inc.*, 130 Nev. 395, 398, 329 P.3d 614, 616 (2014); *see also* 16 Williston on Contracts § 49:14 (4th ed. 2014). Where the text reveals clear meaning viewed in its plain, ordinary, and popular sense, the court cannot look beyond the four corners of the policy. *See Casino W.*, 130 Nev. at 398, 329 P.3d at 616. However, where the meaning remains ambiguous, the court construes the policy against the drafter. *United Nat'l Ins. Co. v. Frontier Ins. Co.*, 120 Nev. 678, 684, 99 P.3d 1153, 1156 (2004). Ambiguity exists if the policy creates "[multiple] reasonable

expectations of coverage as drafted." *Casino W.*, 130 Nev. at 398, 329 P.3d at 616 (alteration in original) (internal quotation marks omitted).

Because the policy does not define the term "direct physical loss or damage," we begin with its plain meaning. *See Okada v. Eighth Judicial Dist. Court*, 134 Nev. 6, 12, 408 P.3d 566, 571 (2018) (consulting dictionary definitions of a term not defined within a statutory scheme); *Casino W.*, 130 Nev. at 400, 329 P.3d at 617 (starting with the dictionary definition in interpreting an insurance policy's exclusionary provision) The word *direct* is commonly defined as "stemming immediately from a result." *Direct, Merriam-Webster's Collegiate Dictionary* 353 (11th ed. 2020); *see also Direct, Black's Law Dictionary* (11th ed. 2019) (defining *direct* as "[f]ree from extraneous influence" and "immediate"). Indeed, the use of "direct" in commercial property insurance policies "signals 'immediate' or 'proximate' cause, as distinct from remote or incidental causes." *New Appleman on Insurance Law Library Edition, supra* § 42.02[3]. *Physical* is defined in part as "having material existence." *Physical, Merriam-Webster's Collegiate Dictionary, supra* at 935; *see also Physical, Black's Law Dictionary* (defining *physical* as "pertaining to real, tangible objects"). *Loss* is defined as "destruction, ruin," and the "act of losing possession." *Loss, Merriam-Webster's Collegiate Dictionary, supra* at 736. Finally, *damage* is defined as "loss or harm resulting from injury to person, property, or reputation." *Id.* at 314.

Rules of grammar also aid interpretation of this policy language. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012) ("Words are to be given the meaning that proper grammar and usage would assign them."). The policy's general coverage grant insures "against all risks of direct physical

loss or damage to covered property." The phrase "to covered property" following "direct physical loss or damage" functions as a "postpositive modifier," such that it applies to both loss and damage. *See id.* at 147 ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series."). Moreover, as a prepositional phrase, "to covered property" links the object of that phrase "with another part of the sentence to show the relationship between them." *See The Chicago Manual of Style* ¶ 5.172 (17th ed. 2017). With the preposition "to," that relationship is generally one of direction. *See id.* Thus, in context, "to" indicates that the object of the preposition (i.e., property) is "the person or thing affected by or receiving something" (i.e., direct physical loss or damage). *See To, Oxford Dictionary of English* 1867 (3d ed. 2010).

"Direct" and "physical" further affect how coverage applies. In the phrase "direct physical loss or damage," both "direct" and "physical" function as prepositive modifiers giving meaning to "loss" and "damage" individually. *See* Scalia & Garner, *supra* 148 (noting that "internal personnel" in the phrase "internal personnel rules and practices of an agency" modifies both "rules" and "practices" (citing *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 764 (D.C. Cir. 1978), *superseded in part by statute as recognized in ACLU of N. Cal. v. FBI*, 881 F.3d 776, 780 n.3 (9th Cir. 2018))). The policy thus establishes two bases for coverage: "direct physical loss" as well as "direct physical damage."

At the same time, "direct" modifies the "idea expressed by the combination of the first adjective and the noun." *See The Chicago Manual of Style, supra* ¶ 5.91. Read together, "direct physical loss" and "direct physical damage" then indicate that there are physical losses and physical

SUPREME COURT
OF
NEVADA

(O) 1947A

13

damages that are *not* direct, but coverage will extend only to those that are direct. *See id.* (using "white brick house" to explain that "a white house could be made of many different materials"). And "[w]hatever is modified" by direct must be direct "[t]o something." *See Jordan*, 591 F.2d at 764. Through the prepositional phrase "to covered property," that something here is the actual property. *See The Chicago Manual of Style*, *supra* ¶ 5.172. Thus, in incorporating the pertinent dictionary definitions and analysis of the phrasing, we conclude that the plain language of "direct physical loss . . . to covered property" requires material or tangible destruction or dispossession as a result of material or tangible impact directed toward the property itself. Meanwhile, the plain language of "direct physical . . . damage to covered property" requires a material or tangible harm or injury directed toward the property itself.[4] *Cf. Uncork &*

---

[4]As previewed above, the other endorsements in the policy, including those that JGB claims coverage under, use identical language—"direct physical loss or damage"—or at least analogous language—"direct result of loss or damage by a peril insured against"—and are dependent on a showing of the peril insured against. Even the interruption by civil or military authority provisions applicable to the business interruption section and other time element endorsements cover only those losses incurred when access to covered property is restricted "as a direct result of *damage* to or *destruction* of property within one (1) statute mile" of the insured property "*by the peril(s) insured against.*" (Emphasis added.) In addition, while they are not followed with the prepositional phrase "to covered property," these endorsements again use analogous language: "to real or personal property covered herein," "of real or personal property," or "to property of a type insured against." Taken together, and given that JGB's coverage claim is dependent on "direct physical loss or damage to covered property" as the general peril insured against, the same requirements imposed by this language apply to the endorsements and specified interruption by civil or military authority provisions. *See PHI Grp., Inc. v. Zurich Am. Ins. Co.*, 58 F.4th 838, 842 n.4 (5th Cir. 2023)

SUPREME COURT
OF
NEVADA

(O) 1947A

14

*Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 931-33 (4th Cir. 2022) (construing the plain meaning of the terms "physical loss" and "physical damage," when used in reference to a defined premises, as "material destruction or material harm" respectively).

Consistent with JGB's argument, "loss" and "damage" here "are not necessarily synonymous." Scott G. Johnson, *What Constitutes Physical Loss or Damage in a Property Insurance Policy?*, 54 Tort Trial & Ins. Prac. L.J. 95, 99 (2019). Yet, though the disjunctive "or" directs that each word retains its own meaning, 1A Norman Singer & Shambie Singer, *Sutherland Statutory Construction* § 21:14 (7th ed. 2009) (discussing how "or" is disjunctive and typically establishes "different meanings because otherwise the statute or provision would be redundant"), they are not wholly "distinct concept[s]," *Uncork & Create LLC*, 27 F.4th at 932 n.8. "Loss" instead "connotes a greater degree of harm than the word 'damage.'" *Id.* "Harm," therefore, is generally a critical feature of both "loss" and "damage."[5] *See Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014) (reasoning that "direct physical loss or damage" "connote[s] actual, demonstrable harm of some form to the premises itself").

Take "fire, water, or smoke"—classic cases of such loss or damage—for example. *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002). These physical forces constitute a

_____

(applying same coverage analysis to time element and civil authority claims because those provisions also required "physical loss or damage").

[5]This harm prerequisite should not be construed to write out cases of theft. *See Verveine Corp. v. Strathmore Ins. Co.*, 184 N.E.3d 1266, 1274 n.12 (Mass. 2022) ("There can of course be 'physical loss of' property without damage . . . if it is stolen or otherwise disappears.").

"physical impediment" necessitating repair or remediation. *Cf. Rose's 1, LLC v. Erie Ins. Exch.*, 290 A.3d 52, 63-64 (D.C. 2023); *see also Port Auth.*, 311 F.3d at 235 (explaining that damage from these sources "may demonstrably alter the components of a building and trigger coverage"). In contrast, courts assessing early disputes under commercial property insurance denied coverage when there was no "direct invasion" of the property. *See Cleland Simpson Co. v. Firemen's Ins. Co. of Newark, N.J.*, 140 A.2d 41, 44-46 (Pa. 1958) (declining coverage in the insurer's favor, under a named-peril policy, for inability to use the property due to a state of emergency absent "crystallization into damage or destruction" by fire).

And, even in much of the caselaw addressing "loss of use" and "uninhabitability" that JGB and amici curiae direct us to, we discern some physical impact culminating in harm to the property. For example, in a leading case on uninhabitability, the court in *Western Fire Insurance Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968), held that "infiltration and contamination of the foundation, walls and rooms of the church building as to render it uninhabitable" was a covered loss. In this way, the building's uninhabitability was contingent on some disabling impact to the property. *See id.* (describing the covered loss of use as not just the loss of use of the church "viewed in splendid isolation," but as the "consequential result of . . . the accumulation of gasoline around and under the church building"). The same defining characteristic—the property's accompanying physical impairment—underscores other instances of uninhabitability. *See, e.g., Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, No. 1:15-cv-01932-CL, 2016 WL 3267247, at *4 (D. Or. June 7, 2016) (holding that coverage existed because an outdoor theatre "sustained 'physical loss or damage to property' when the wildfire

smoke infiltrated the theater and rendered it unusable for its intended purpose"), *vacated by joint stipulation*, No. 1:15-cv-01932-CL, 2017 WL 1034203 (D. Or. Mar. 6, 2017); *Ass'n of Apartment Owners of Imperial Plaza v. Fireman's Fund Ins. Co.*, 939 F. Supp. 2d 1059, 1061-62, 1069 (D. Haw. 2013) (recognizing that arsenic in flooring materials invaded concrete slab so as to cause a continuous injury of "direct physical loss or damage").

Whether one calls this a "distinct, demonstrable, physical alteration" as Starr urges, or something else, insurable uninhabitability or loss of use depends on some essential harm—some "detriment, disablement, . . . [or] ruin"—to the property itself. William C. Burton, *Burton's Legal Thesaurus* 472 (6th ed. 2021) (listing synonyms for the word "harm"); *see also Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 404-05 (6th Cir. 2021) (summarizing that coverage in loss of use caselaw exists where the property "became practically useless for anything"). At bottom, "'[p]hysical' has to mean something." *Wakonda Club v. Selective Ins. Co. of Am.*, 973 N.W.2d 545, 549, 552 (Iowa 2022) (interpreting "direct physical loss of or damage to property" in a COVID-19 property insurance dispute and reasoning that such language requires that the property loss have a "physical aspect"). We cannot, therefore, base coverage on economic loss alone. *See Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 456 (5th Cir. 2022). As illustrated, our assessment under the physical loss or damage provisions asks whether the property experienced material or tangible dispossession, destruction, harm, or injury, "rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business

consequences that flow from such closure." *See Great N. Ins. Co.*, 17 F. Supp. 3d at 331.

*Because the claimed losses stemming from the physical presence of SARS-CoV-2 virus do not fall within the ordinary meaning of the policy's direct physical loss or damage coverage as a matter of law, the district court erred in not granting summary judgment in Starr's favor*

Starr contends that JGB does not satisfy the plain meaning of the policy's direct physical loss or damage requirement, as the presence of COVID-19 neither physically alters the property nor requires the intervention that property damage or loss necessitates. Further, Starr argues that coverage cannot stand on JGB's temporary loss of use of the insured premises without any detriment to the property itself. JGB argues that the district court correctly denied the summary judgment motion because it provided substantial evidence that the COVID-19 virus creates loss by rendering the Shops unusable or uninhabitable, or damage by physically altering the property. It also contends that such "direct physical loss or damage" does not require loss or damage visible to the naked eye.

As a threshold matter, the inability to see the COVID-19 virus with the naked eye is not the deciding factor. Both physical loss and physical damage can arise from invisible or microscopic forces, as they have a physical presence and occupy physical space. To hold otherwise would ignore a litany of physical forces, such as odors, noxious gasses, asbestos, or lead, for instance, that can jeopardize the property. *See, e.g., Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 413 (D. Conn. 2002) (recognizing that asbestos and lead were "contaminating conditions" that could cause property loss or damage); *Mellin v. N. Sec. Ins. Co.*, 115 A.3d 799, 803-05 (explaining that "physical loss" "encompass[es] changes that

SUPREME COURT
OF
NEVADA

(O) 1947A

18

are perceived by sense of" smell, sight, or touch when assessing whether coverage could exist for cat urine).

However, even taking JGB's unrebutted, scientific evidence as true, it fails to demonstrate how the Shops were subject to the type of material, tangible harm constituting direct physical loss or damage "within the meaning of the policy." *See Schleicher & Stebbins Hotels, LLC v. Starr Surplus Lines Ins. Co.*, No. 2022-0155, 2023 WL 3357980, at \*3 (N.H. May 11, 2023) (publication pending). First, JGB offers evidence that the COVID-19 virus "is a physical particle that deposits *on* the property and lasts for days." (Emphasis added.) But "direct physical loss or damage to covered property" requires something more involved—the property must receive or be affected by actual physical harm. *See To, Oxford Dictionary of English, supra* at 1867; *see also Verveine Corp.*, 184 N.E.3d at 1273 (explaining that the "direct physical loss or damage" language "characterizes what effects the covered causes must have on the property to trigger coverage, not the causes themselves"). SARS-CoV-2's presence on the property, on the other hand, indicates mere placement on the property. *See The Chicago Manual of Style, supra* ¶ 5.172 (stating that "on" indicates the "notion[ ]" of position). Presence of a physical virus on the property, even if it "attaches to" the property, does not give rise to the necessary transformative element of something like "fire, water, or smoke." *See Port Auth.*, 311 F.3d at 236. Otherwise, the alleged presence of a physical force would "render[ ] every sneeze, cough, or even exhale" a qualifying harm. *Cosmetic Laser, Inc. v. Twin City Fire Ins. Co.*, 554 F. Supp. 3d 389, 407 (D. Conn. 2021), *appeal dismissed*, No. 21-2160-CV, 2022 WL 4111813 (2d Cir. Apr. 13, 2022). Ultimately, as the Wisconsin Supreme Court recently observed, "the presence of COVID-19 does not

constitute a physical loss of or damage to property because it does not alter the appearance, shape, color, structure, or other material dimension of the property." *Colectivo Coffee Roasters, Inc. v. Soc'y Ins.*, 974 N.W.2d 442, 447 (Wis. 2022).

Next, evidence that the virus remains harmful while in the air or as "fomites" is similarly unconvincing because it does not demonstrate that the virus is harmful *to the property*.[6] At most, SARS-CoV-2's virality in the air is evidence of harm imperiling people, not property. Commercial property insurance is concerned with the converse: "[T]he policies insure property, not people." *Schleicher*, 2023 WL 3357980, at *7; *see also Tapestry, Inc. v. Factory Mut. Ins. Co.*, 286 A.3d 1044, 1060 (Md. 2022) (explaining that scientific evidence illustrating "how Coronavirus particles[ ] are expelled . . . and are then dispersed more widely into the surrounding air" is not evidence that those same particles "physically damage[ ] air over which [the policyholder] has possessory rights"). JGB's evidence that the virus can spread via harmful "fomites" once it lands on the surface of property suffers from the same problem, as it does not indicate that the property was actually harmed. *Cf. Brown Jug, Inc. v.*

---

[6]The Oxford Dictionary of English defines *fomite* as "objects or materials which are likely to carry infection, such as clothes, utensils, and furniture." *Fomite, Oxford Dictionary of English, supra* at 680. In the COVID-19 context, JGB explained how SARS-CoV-2 "can land on and attach to property," such that the virus is "capable of transmission on property in the form of fomites." And amicus curiae Nevada State Medical Association relied on a scientific article explaining that "transmission via fomites (contaminated surfaces) . . . is possible for SARS-CoV-2." Ana K. Pitol & Timothy R. Julian, *Community Transmission of SARS-CoV-2 by Surfaces: Risks and Risk Reduction Strategies*, 8 Env't Sci. & Tech. Letters, Issue 3, 263, 263 (2021).

*Cincinnati Ins. Co.*, 27 F.4th 398, 404 (6th Cir. 2022) (utilizing ordinary meaning of "direct physical loss" in dismissing allegations that failed to allege harm). Fomite-based transmission instead typifies another way the virus "pos[es] health risk to humans," as opposed to property. *Tapestry*, 286 A.3d at 1060. Though this evidence shows that the COVID-19 virus is "harmful," it simply does not equate to evidence that any property suffered physical harm. *See Sagome, Inc. v. Cincinnati Ins. Co.*, 56 F.4th 931, 935 (10th Cir. 2023) ("[T]he loss or damage itself must be physical, not simply stem from something physical.").

JGB's remaining evidence of its own remediation efforts does not support a coverable loss or damage, either. Both the business interruption section and the extra expense endorsement measure recovery based on the "period of indemnity," which begins at "the date of direct physical loss or damage" and ends "on the date when the damaged or destroyed property . . . should be *repaired, rebuilt or replaced* with the exercise of due diligence and dispatch." (Emphasis added.) The rental value endorsement measures recovery similarly. Yet, JGB and its tenants implemented social-distancing, plexiglass installation, sanitizing mechanisms, and regular cleaning. Such preventive measures do not aim to "repair, rebuil[d], or replace[]" the property; they aim to redress the way people pose harm to one another by carrying and transmitting the virus at the property.

The same is still true in view of JGB's and amici's assertions that routine cleaning does not remove the rapidly redepositing SARS-CoV-2 from the property. Even then, the Shops remain "physically intact and functional," and the property is "neither lost nor changed" due to the presence of the virus in the interim. *Cajun Conti LLC v. Certain*

SUPREME COURT
OF
NEVADA

(O) 1947A

21

*Underwriters at Lloyd's, London,* 359 So. 3d 922, 927 (La. 2023). Indeed, if direct physical loss or damage to property existed because people on or inside of it may spread illnesses, an insured operating a school, hospital, gym, or dormitory could convert its property insurance policy into a "maintenance contract" for the "inevitable" risk of illness in public spaces. *See Port Auth.,* 311 F.3d at 236. This "cannot be right." *See Cosmetic Laser,* 554 F. Supp. 3d at 407 (rejecting coverage for losses related to COVID-19 under property insurance policy despite "truism that mucus or saliva, ejected from a sneeze, attaches and adheres to surfaces"). Accordingly, just as JGB's claimed remediation efforts fall short of those contemplated in the policy, so does its claimed "physical alteration" fail to constitute that contemplated in the policy. *See Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.,* 15 F.4th 885, 892 (9th Cir. 2021).

We recognize that JGB supplied evidence that facially bolsters an uninhabitability or loss-of-use theory of "direct physical loss or damage." Not only did the pandemic lead to the Shops' temporary and even some tenants' permanent closure, but SARS-CoV-2 also at first blush appears to share the "contaminating" nature of physical forces in many uninhabitability cases. *See New Appleman on Insurance Law Library Edition, supra* § 46.03[3][a] ("Contamination of property by vapors, bacteria, or other foreign substances has been found to constitute 'physical' loss when it renders the property essentially unusable."); *see also, e.g., Motorists Mut. Ins. Co. v. Hardinger,* 131 F. App'x 823, 824, 826 (3d Cir. 2005) (E. coli bacteria); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.,* No. 2:12-cv-04418 (WHW) (CLW), 2014 WL 6675934, at *1 (D.N.J. Nov. 25, 2014) (ammonia); *Farmers Ins. Co. of Oregon v.*

*Trutanich*, 858 P.2d 1332, 1334 (Or. App. 1993) (methamphetamine odor); *Mellin*, 115 A.3d at 801 (cat urine odor in condominium unit).

Still, this case differs from cases in which potential coverage was found based on uninhabitability or loss of use. Uninhabitability cases are often characterized by a physical force that originates in the property. *See, e.g., Yale*, 224 F. Supp. 2d at 404 (building built with asbestos and lead products causing contamination); *Gregory Packaging*, 2014 WL 6675934, at *1 (refrigerator installed in facility used anhydrous ammonia as refrigerant). These forces were not, as is the case here, merely present at the property by way of people breathing, sneezing, or coughing throughout the property. *Cf. Hardinger*, 131 F. App'x at 827 (well was the source of E. coli bacteria); *Oregon Shakespeare Festival Ass'n*, 2016 WL 3267247, at *1 ("smoke from a nearby wildfire filled" the property). And in those cases, even when the force does not originate within the property, it is so connected to the property that the property effectively becomes the source of its own loss or damage. *See, e.g., Mellin*, 115 A.3d at 801 (N.H. 2015) (describing how owners tried several times to eliminate the cat urine odor in the condominium unit to no avail); *Cook v. Allstate Ins. Co.*, No. 48D02-0611-PL-01156, 2007 Ind. Super. LEXIS 32, *1-2 (Ind. Super. Ct. Nov. 30, 2007) (detailing multiple failed attempts to remove brown recluse spiders from the home). The continued livelihood of these forces stemmed from the *property* itself, by physically entering and becoming endemic to the property. But the livelihood of the COVID-19 virus does not stem from the property itself; it stems from the *people* who frequent the property.

In this vein, where coverage is found, the property typically exhibits some sort of defect jeopardizing the property's habitability or

function. *Compare Olmsted Med. Ctr. v. Cont'l Cas. Co.*, 65 F.4th 1005, 1009 (8th Cir. 2023) (rejecting the idea that "direct physical loss or damage is established whenever property cannot be used for its intended purpose" (emphasis omitted) (quoting *Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 400 F.3d 613, 616 (8th Cir. 2005))), *with* Ostrager & Newman, *supra* 1573 (explaining that some courts may allow coverage "[w]here the loss of use is a result of some physical damage or alteration to the property"). For example, damage from mold contamination was covered where it resulted from "defective workmanship." *See Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, No. CV-01-1362-ST, 2002 WL 31495830, at *3 (D. Or. June 18, 2002). Carbon monoxide damage was likewise insurable where it stemmed from a dysfunctional chimney. *See Matzner v. Seaco Ins. Co.*, No. 96-0498-B, 1998 WL 566658, at *1, *4 (Mass. Super. Aug. 12, 1998) (finding coverage for damage from carbon monoxide due to faulty chimney). These covered risks arose from the property, even if their secondary effect posed health risks to people at the property. Here, however, both the problem of COVID-19 and its associated health risks are entirely dependent on people being present at the property, rather than arising from any harm to or defect in the property itself. *See Kim-Chee LLC v. Phila. Indem. Ins. Co.*, 535 F. Supp. 3d 152, 161 (W.D.N.Y. 2021) (acknowledging that COVID-19 poses a "mortal hazard to humans, but little or none to buildings which remain intact and available for use once the human occupants no longer present a health risk to one another"), *aff'd*, No. 21-1082-cv, 2022 WL 258569 (2d Cir. Jan. 28, 2022).

The absence of a defect both inherent to the property and that compromises the property's essential function reaffirms why summary

SUPREME COURT
OF
NEVADA

(O) 1947A

24

judgment is appropriate here. There are many ways that real or personal property may cease to be useful. Not all of them are inherent to the property. Here, too, people might be dissuaded from visiting the Shops for a host of reasons: the weather, the market, their preferences, or even their personal health and well-being. None of these reasons show property loss or damage, and JGB likewise has not provided evidence creating a material issue of fact to the contrary.

For these same reasons, we also conclude that coverage cannot exist under the civil or military authority and ingress/egress provisions. Coverage under those provisions depends on restricted access due to "damage to or destruction of property . . . by peril(s) insured against" within one mile of the Shops or as a "direct result of loss or damage by a peril insured against" within one mile of the Shops, respectively. In the same way the Shops did not experience the peril of "direct physical loss or damage," it follows that JGB's evidence does not support that the Shops or the property within one mile of it are subject to the kind of harm contemplated under these policy provisions as a matter of law. *See 10E, LLC v. Travelers Indem. Co. of Conn.*, 483 F. Supp. 3d 828, 837 (C.D. Cal. 2020) (rejecting coverage under a civil authority endorsement "[f]or similar reasons" that the court rejected coverage under a business interruption and extra expense endorsement because the complaint did not allege loss or damage to property).

In sum, we conclude that the district court clearly erred in denying Starr summary judgment on JGB's breach of contract and declaratory relief claims because JGB's evidence in opposing summary judgment does not create a genuine dispute of material fact as to the existence of "direct physical loss or damage" as required for coverage

under the policy. The evidence, taken as true, demonstrates only economic loss sustained amidst a worldwide pandemic. Because such economic loss was not caused by direct physical loss or damage to the property, we would turn away from "the North Star of this property insurance policy" should we uphold the summary judgment denial under these circumstances. *See Santo's*, 15 F.4th at 402. Accordingly, Starr is entitled to summary judgment on these remaining claims in light of JGB's failure to make a showing sufficient to establish coverage. We join a striking majority of our colleagues across the country in reaching this conclusion. *See Oregon Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1071 n.1 (9th Cir. 2023) (noting "more than 800 cases nationwide").

*The pollution and contamination exclusion also bars coverage because the policy explicitly and unambiguously defines "pollution or contamination" to include a virus*

Even if we found JGB's position on the existence of "direct physical loss or damage" persuasive here, Starr maintains that the pollution and contamination exclusion otherwise bars coverage because the definition of "pollutants or contaminants" in the policy undisputedly includes "virus." JGB contends that the COVID-19 virus does not fall within the type of virus referenced in that definition, as the definition's surrounding context shows that the exclusion is intended to preclude coverage only for "traditional environmental pollution." Situated in this context, JGB argues that "virus" is intended to exclude coverage only for viruses stemming from pollution, such as "when a wastewater treatment plant releases virus-containing waste into the water supply."

An exclusion "must be narrowly tailored so that it 'clearly and distinctly communicates to the insured the nature of the limitation, and specifically delineates what is and is not covered.'" *Casino W.*, 130 Nev. at

SUPREME COURT
OF
NEVADA

(O) 1947A

26

398, 329 P.3d at 616 (quoting *Griffin v. Old Republic Ins. Co.*, 122 Nev. 479, 485, 133 P.3d 251, 255 (2006)). Therefore, the onus falls on the insurer to use "obvious and unambiguous language" in drafting the exclusion, indicative of the "only reasonable interpretation." *Id.* at 399, 329 P.3d at 616. An insurer also carries the burden of "establish[ing] that the exclusion plainly applies to the particular case before the court." *Id.*; *see also* Stempel & Knutsen, *supra* § 15.01[C] ("[E]stablished coverage can be defeated or reduced only if the insurer shoulders the burden of persuasion to establish the applicability of an exclusion . . . that reduces or restricts coverage.").

Thus, analysis of the exclusion here must begin with the plain text. In interpreting policy language in its "ordinary and popular sense," the court must step into the shoes of "one not trained in law or in insurance." *Casino W.*, 130 Nev. at 398, 329 P.3d at 616 (internal quotation marks omitted). Nevertheless, "[o]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise." *See* Scalia & Garner, *supra* at 70; *see also Galardi v. Naples Polaris, LLC*, 129 Nev. 306, 310, 301 P.3d 364, 367 (2013). If two reasonable interpretations exist, the exclusion is ambiguous, and the court should construe the ambiguity "against the drafting party and in favor of the insured." *See Farmers Ins. Grp. v. Stonik By & Through Stonik*, 110 Nev. 64, 67, 867 P.2d 389, 391 (1994). We look to the policy language as a whole in our assessment, seeking to avoid absurd results. *Casino W.*, 130 Nev. at 398, 329 P.3d at 616.

The initial question here—a question of law—is then whether the meaning of "virus" as used in the pollutants or contaminants definition clearly encompasses SARS-CoV-2 and thereby bars coverage under the

SUPREME COURT
OF
NEVADA

(O) 1947A

exclusion. *See Farmers Ins. Exch. v. Neal*, 119 Nev. 62, 64, 64 P.3d 472, 473 (2003) (addressing extent of coverage as a legal question). We conclude it does. The definition explicitly lists "virus" as one of the excluded pollutants or contaminants. *Virus* is commonly defined as "the causative agent of an infectious disease" or "any of a large group of submicroscopic infective agents that are regarded either as extremely simple microorganisms or as extremely complex molecules, that typically contain a protein coat surrounding an RNA or DNA core." *Virus, Merriam-Webster's Collegiate Dictionary, supra* at 1397-38. It is undisputed that SARS-CoV-2 is a virus. Thus, an ordinary and popular understanding from "one not trained in law or insurance" of the word "virus" extends to the SARS-CoV-2 *virus. See Casino W.*, 130 Nev. at 398, 329 P.3d at 616.

Our decision in *Casino West* does not compel a different result. There, we held that an "absolute pollution" exclusion in a commercial general liability policy that defined *pollutant* as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste" was susceptible to more than one reasonable interpretation. *Casino W.*, 130 Nev. at 399-400, 329 P.3d at 616-17. One interpretation included carbon monoxide as part of those excluded pollutants, while the other limited the exclusion to only traditional environmental pollution. *Id.* at 399, 329 P.3d at 616-17. These competing interpretations required that we construe the provision against the insurer and hold that the exclusion would not bar coverage for injuries caused by carbon monoxide. *Id.* at 401, 329 P.3d at 618. Crucially, our conclusion warned insurers that they "must plainly state" the outer bounds of an exclusion with "obvious and unambiguous language." *See id.*

SUPREME COURT
OF
NEVADA

(O) 1947A

at 401, 329 P.3d at 618 (second clause quoting *Powell v. Liberty Mut. Fire Ins. Co.*, 127 Nev. 156, 164, 252 P.3d 668, 674 (2011)). In *Casino West*, the insurer failed to do so. Here, Starr has; it unambiguously listed "virus" as an excluded pollutant or contaminant. *See Zwillo V, Corp. v. Lexington Ins. Co.*, 504 F. Supp. 3d 1034, 1042 (W.D. Mo. 2020) (rejecting policyholder's reading of a similar pollution and contamination exclusion that would cabin the excluded viruses to those of traditional environmental pollution because such a reading "requires overlooking the word 'including'" preceding a list of excluded contaminants). This makes *Casino West* fundamentally different from the case at hand.

True, the exclusion and definition here parrot some of the same language of that in *Casino West* giving rise to ambiguity. *See* 130 Nev. at 400, 329 P.3d at 617. Yet, the Starr policy also includes the word "virus." While the other listed substances might be indicative of "traditional environmental pollution" themselves, the addition of "virus" transforms the clause into one excluding both a "health-harming contaminant[ ]" like a virus "*and* environmental pollutants." *See Circus Circus LV, LP v. AIG Specialty Ins. Co.*, 525 F. Supp. 3d 1269, 1278 (D. Nev. 2021), *aff'd*, No. 21-15367, 2022 WL 1125663 (9th Cir. Apr. 15, 2022). Other courts have held similarly under analogous circumstances. *See, e.g.*, *Zwillo V, Corp.*, 504 F. Supp. 3d at 1042-43; *Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108, 121 (S.D.N.Y. 2021) (rejecting a construction of "contamination" that would exclude "one of the terms in its contractual definition"). In fact, a court interpreting the same exclusion in a Starr policy held that it precluded coverage for similar alleged loss or damage. *See Ford of Slidell, LLC v. Starr Surplus Lines Ins. Co.*, No. CV 21-858, 2021 WL 5415846, at *10-11 (E.D. La. Nov. 19, 2021).

No doubt, context is important in interpreting policy language. *See Galardi*, 129 Nev. at 310, 301 P.3d at 367. In that regard, JGB points to *C.J. Segerstrom & Sons v. Lexington Insurance Co.*, No.: 8:22-cv-00466-MEMF-JDEx, 2023 U.S. Dist. LEXIS 33293 (C.D. Cal. Feb. 27, 2023), which held that the surrounding language in a pollution and contamination exclusion like that in this case was enough to supply a reasonable interpretation of coverage limiting "virus" to that of traditional environment pollution. Still, *Segerstrom* is otherwise distinguishable. The court there was also "guided" by an express coverage grant for outbreaks of communicable diseases. *Segerstrom*, 2023 U.S. Dist. LEXIS 33293, at *19-20. Here, the policy contains no such coverage grant.

Even if we could not distinguish *Segerstrom*, context does not write out explicit terms. *See Farmers Ins. Grp.*, 110 Nev. at 67, 867 P.2d at 391 (explaining that this court will neither "rewrite contract provisions that are otherwise unambiguous" nor "increase an obligation to the insured where such was intentionally and unambiguously limited by the parties"). In particular, though we must import context into our interpretation, embracing JGB's reading of "virus" would ignore our equally compelling directive to adopt the viewpoint of "the layperson untrained in the law or the insurance business." 44A Am. Jur. 2d *Insurance* § 2038 (2013); *see also Casino W.*, 130 Nev. at 398, 329 P.3d at 616. Given that the defined pollutants or contaminants in this policy expressly include "virus," we are not prepared to say that someone untrained in law or insurance would think that the ordinary and popular meaning of a virus, even situated among other pollutants, would refer only to viruses such as the suggested wastewater-based viruses. *See Casino W.*, 130 Nev. at 399, 329 P.3d at 616-17; *Williston on Contracts, supra* §

Supreme Court
of
Nevada

(O) 1947A

30

49:17 ("[A] policy is not ambiguous simply because creative possibilities as to its meaning can be suggested by the parties." (internal quotation marks omitted)).

Also telling, many of the cases that JGB points to in arguing that COVID-19 causes "direct physical loss or damage" are often labeled "contamination" cases. *See New Appleman on Insurance Law Library Edition, supra* § 46.03[3][a]; *see Rose's 1*, 290 A.3d at 64. The provision here is a contamination exclusion. Therefore, under JGB's direct-physical loss-or-damage theory, arguing that the presence of SARS-CoV-2 physically affects the property, its "claims allege contamination and fall within this exclusion." *Lindenwood Female Coll. v. Zurich Am. Ins. Co.*, 61 F.4th 572, 574 (8th Cir. 2023).

Finally, the International Organization for Standardization's (ISO) standardized "absolute virus exclusion" provides only tangential support for JGB's position. Though ISO began recommending that insurers incorporate this exclusion following the 2006 SARS outbreak, its existence does not prove that the word "virus" in this policy must be limited to that stemming from pollution events. Instead, the ISO recommendation simply reveals a better practice for excluding a COVID-19-type claim than what the parties have done here. *See* ISO Form CP 01 40 07 06(C) ("With respect to any loss or damage subject to the exclusion in Paragraph B., *such exclusion supersedes any exclusion relating to "pollutants."* (italics added)). A more ideal approach, however, does not render the plain language used here moot or subject to a different interpretation. *See Restatement (Second) of Contracts* § 212 cmt. b (Am. Law Inst. 1981) ("[W]ords of an integrated agreement remain the most

(O) 1947A

important evidence of intention.").[7] We thus conclude that the exclusion stands as an independent basis warranting summary judgment in Starr's favor.

## CONCLUSION

We conclude that the district court erred in denying summary judgment because JGB's claims cannot stand as a matter of law. In opposing summary judgment, JGB did not make a showing of the "direct physical loss or damage to covered property" required to establish coverage under Starr's commercial property insurance policy. The fact that the COVID-19 virus was present in or on the property does not establish that there was any physical harm to the property as required. Moreover, because the policy's pollution and contamination exclusion applies to a "virus," even if they would otherwise be covered, JGB's claims for losses resulting from COVID-19 are excluded from coverage. While we are sympathetic to the economic woes JGB—and so many other businesses in Nevada—suffered as a result of the COVID-19 pandemic, its claim for coverage under this type of insurance policy falls short. Accordingly, we grant the petition and direct the clerk of this court to issue a writ of mandamus directing the district court to vacate its order denying Starr's motion for summary judgment on the breach of contract and declaratory

---

[7]We are not persuaded by the other caselaw JGB offers as supplemental authority, as JGB overreads the cases' holdings. *See, e.g., Novant Health Inc. v. Am. Guarantee & Liab. Ins. Co.,* 563 F. Supp. 3d 455, 460-62 (M.D.N.C. 2021) (denying motion to dismiss where there was a question as to whether the exclusion was jurisdictionally applicable); *Sac. Downtown Arena LLC v. Factory Mut. Ins. Co.,* 637 F. Supp. 3d 865, 871 (E.D. Cal. 2022) (refusing to apply the pollution and contamination exclusion because the policy contained a communicable disease endorsement).

relief claims and enter an order granting summary judgment in Starr's favor.[8]

_____ , J.
Cadish

We concur:

_____ , C.J.
Stiglich

_____ , J.
Herndon

_____ , J.
Parraguirre

_____ , J.
Pickering

_____ , J.
Lee

_____ , J.
Bell

_____

[8]In light of this decision, we lift the stay of proceedings imposed by our July 29, 2022, order.

SUPREME COURT
OF
NEVADA

(O) 1947A